IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BILLY G. SNYDER, | ) | CASE NO. 1:25-CV-02470-CAB |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Billy Snyder ("Plaintiff" or "Snyder"), challenges the final decision of Defendant, Frank Bisignano, Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In November 2023, Snyder filed an application for POD and DIB, alleging a disability onset date of November 13, 2022, and claiming he was disabled due to depression, anxiety, agoraphobia, type 2 diabetes, sleeping all day, problems concentrating, stomach, headache, getting sweaty and hot in public places, and an inability to get out of his vehicle when in public, crowded events. (Transcript ("Tr.") 27, 95.) The

application was denied initially and upon reconsideration, and Snyder requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 27.)

On November 20, 2024, an ALJ held a hearing, during which Snyder, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On December 12, 2024, the ALJ issued a written decision finding Snyder was not disabled. (*Id.* at 27-44.) The ALJ's decision became final on September 19, 2025, when the Appeals Council declined further review. (*Id.* at 1-6.)

On November 13, 2025, Snyder filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 6-7.) Snyder asserts the following assignments of error:

(1) The ALJ failed to include even non-severe mental health limitations in the RFC.

(2) The ALJ failed to provide a full and fair hearing which impeded on Plaintiff's due process rights and inability to ensure full record development.

(Doc. No. 6.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Snyder was born in May 1979 and was 45 years old at the time of his administrative hearing (Tr. 27, 42), making him a "younger" person under Social Security regulations. *See* 20 C.F.R. § 404.1563(c). He has a limited education. (Tr. 42.) He has past relevant work as a salvage laborer. (*Id.*)

### B. Relevant Medical Evidence[1]

On January 31, 2023, Snyder saw Israel J. Cajigas, M.D., for follow up regarding his diabetes and hypertension. (*Id.* at 358-59.) Snyder reported that he had established care with psychiatry for medication

[1] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Snyder challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to Snyder's mental impairments.

management. (*Id.* at 360.) He endorsed a depressed mood, anhedonia, decreased motivation, and decreased energy, as well as intermittent anxiety. (*Id.*) He denied any suicidal or homicidal ideation or self-harming behavior. (*Id.*) Snyder told Dr. Cajigas he had been prescribed Lamictal and would be picking it up from the pharmacy. (*Id.*) On examination, Dr. Cajigas noted Snyder was nervous/anxious but found a normal mood, normal behavior, and normal thought content. (*Id.* at 361-62.) Dr. Cajigas directed Snyder to maintain his follow-up appointments with psychiatry and encouraged Snyder to reestablish care for counseling/therapy. (*Id.* at 359.)

On March 17, 2023, Snyder sought emergency treatment for nausea, vomiting, and chills for the past two days. (*Id.* at 335-36.) Snyder denied any psychiatric or behavioral concerns. (*Id.* at 336.) Treatment providers found a normal mood on examination. (*Id.* at 339.)

On October 26, 2023, Snyder sought emergency treatment for abdominal pain, nausea, and vomiting for the past three days, and reported blood sugar levels over 300. (*Id.* at 292-93.) Snyder denied confusion and any psychiatric or behavioral concerns. (*Id.* at 293.) On examination, treatment providers found a normal mood and normal behavior, thought content, and judgment. (*Id.* at 297.)

On December 1, 2023, Snyder sought emergency treatment for right shoulder pain and denied confusion and any psychiatric or behavioral concerns. (*Id.* at 770-71.) On examination, treatment providers found a normal mood and normal behavior, thought content, and judgment. (*Id.* at 775.)

On February 16, 2024, Snyder saw Deborah Koricke, Ph.D., for a consultative psychological examination. (*Id.* at 738.) Snyder reported seeking disability benefits for his diabetes, anxiety, agoraphobia, and major depression. (*Id.* at 739.) He dropped out of high school in his senior year and never obtained a GED. (*Id.*) He left his job in 2019 after 10.5 years because his boss refused to give him a raise. (*Id.*) He told Dr. Koricke he was not looking for work now because of his medical and psychiatric conditions. (*Id.*) Snyder denied any mental health hospitalizations, as well as suicidal and homicidal ideation. (*Id.*) He also

denied hearing voices or seeing visions. (*Id.* at 740.) He reported having seen a psychologist in 2019 and seeing a counselor at the Nord Center in 2020. (*Id.*) He recently started seeing a counselor at the Charak Center. (*Id.*) Snyder endorsed sleep difficulties, as well as napping in the afternoon. (*Id.*) He told Dr. Koricke he had anxiety and panic attacks, especially when in public, and he was uncomfortable around others. (*Id.*) He took Paxil daily, but he felt that it was insufficient to manage his symptoms. (*Id.*)

On examination, Dr. Koricke found cooperative and pleasant behavior, appropriate eye contact, and adequate social skills. (*Id.* at 741.) Dr. Koricke further found normal speech, a coherent and goal-directed thought process, "somewhat limited" insight, and "no objective sign of agoraphobia, panic attacks, or anxiety." (*Id.* at 741-42.) Dr. Koricke noted Snyder "did not present as anxious even though he was in an unusual place alone that he had never been to before." (*Id.* at 742.) Snyder's diagnoses consisted of generalized anxiety disorder, panic disorder, and unspecified depressive disorder. (*Id.* at 743.) Dr. Koricke opined that Snyder could understand, remember, and carry out instructions; he had the ability to return to a job; he could respond appropriately to others in the workplace; and he could react appropriately in a work setting. (*Id.* at 743-44.)

On March 1, 2024, Snyder saw Dr. Cajigas for follow up and denied worsening mood, suicidal or homicidal ideation, self-harming behaviors, and problems with anxiety or panic. (*Id.* at 753-54.) On examination, Dr. Cajigas found a normal mood, behavior, and thought content. (*Id.* at 755.)

**C. State Agency Reports**

On March 1, 2024, Valerie Budervic, Psy.D., reviewed the file and opined that Snyder had mild limitations in his ability to interact with others and adapt or manage himself, and no limitations in his ability to understand, remember, or apply information and concentrate, persist, or maintain pace. (*Id.* at 98-99.) Dr. Budervic opined that:

> Given totality of information and preponderance of evidence, Clmt is reasonably expected to, at most, experience mild limitations across functional

> domains solely due to psych conditions. Clmt's psych MDI are considered non severe at this time. The clmt would be able to persist, understand, remember, and carry out instructions without any substantial issues dealing with stress and coworkers.

(*Id.* at 99.)

On April 19, 2024, on reconsideration, Katherine Fernandez, Psy.D., affirmed Dr. Budervic's findings. (*Id.* at 106-07.)

**D. Hearing Testimony**

During the November 20, 2024 hearing, Snyder testified to the following:

- He lives with his daughter and his girlfriend. (*Id.* at 59.) They have been homeless since 2020. (*Id.*) They have lived with friends or in their car. (*Id.*) They bought a camper and are now staying at his niece's. (*Id.*)

- He experiences anxiety almost every day. (*Id.* at 55.) Being in public, being around people, and stress trigger his anxiety. (*Id.*) He gets a "fight or flight" feeling when he is around other people, and he tends to get angry and mad. (*Id.*) He does not want to lash out at other people. (*Id.*) Through therapy, he now believes childhood trauma caused his anxiety. (*Id.* at 55-56.)

- He just started seeing a new counselor. (*Id.* at 56.) It had been two years since he saw a counselor. (*Id.*) He left Nord Center because he did not like how they handled appointments and scheduling. (*Id.* at 58.) He tried to find different providers, and he was homeless and did not have a phone for a while. (*Id.* at 58-59.)

- He suffers from hallucinations. (*Id.* at 60.) He sees "shadow people" out of the corners of his eyes. (*Id.*) He hears what sounds like children laughing or talking in his ears when no one is there. (*Id.*) He hears noises and sounds like something is moving when it is not. (*Id.*) This happens on and off throughout the day. (*Id.*) The only thing he can do to control it is to go back to sleep and ignore it. (*Id.*) He experiences these symptoms six out of seven days a week. (*Id.*) The more stressed he is, the more it happens. (*Id.* at 60-61.) His hallucinations have worsened since 2019. (*Id.* at 62.) He thinks his blood sugar "kind of goes" with his hallucinations too, although he is unsure. (*Id.*)

- From 6:00 a.m. to 6:00 p.m., he sleeps at least half that time. (*Id.* at 61.) He sleeps all day sometimes, especially if he has a migraine. (*Id.*) The hallucinations occur separately from and along with his migraines. (*Id.*) Migraines make his hallucinations more intense. (*Id.*) His therapist prescribed migraine medication. (*Id.*) He just started his second week on this medication, and it is too soon to tell if it is helping. (*Id.*)

- His medications make him more drowsy, edgy, and irritated. (*Id.* at 63.)

The ALJ found Snyder had past work as a salvage laborer. (*Id.* at 55.) The ALJ then posed the following hypothetical question:

> I want you to assume an individual similar to the claimant in age, education, and work history, who can lift and carry up to 10 pounds frequently, and up to 20 pounds occasionally. This person should never climb ladders, ropes, and scaffolds, can occasionally climb ramps and stairs, can occasionally balance, stoop, kneel, crouch, and crawl. As you have reviewed this hypothetical individual, can you tell me whether or not this individual -- obviously, they can't return to past work because it was heavy, but can you identify any work for such a person?

(*Id.* at 64.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as housekeeping cleaner, mail sorter, and merchandise marker. (*Id.*)

The ALJ modified the hypothetical to add the following environmental limitations: never work in unprotected heights or operate moving mechanical parts; cannot operate a motor vehicle for commercial purposes; can frequently be exposed to dust, odors, fumes, pulmonary irritants, and vibration; and can work in a loud noise environment. (*Id.* at 65.) The VE testified that the previously identified jobs would remain. (*Id.*)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Snyder was insured on the alleged disability onset date, November 13, 2022, and remained insured through December 31, 2024, the date last insured ("DLI"). (Tr. 27, 29.) Therefore, in order to be entitled to POD and DIB, Snyder must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since November 13, 2022, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: diabetes mellitus; essential hypertension; hyperlipidemia; migraine headaches; and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl. He can never work at unprotected heights, around or operate moving mechanical parts, or operate a motor vehicle for commercial purposes. He can frequently be exposed to dust, odors, fumes and pulmonary irritants and vibration. He can work in an environment with up to loud noise levels.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May **, 1979 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has a limited education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

(Tr. 31-43.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the

Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. First Assignment of Error: RFC

In Snyder's first assignment of error, he argues that the ALJ failed to include any mental health limitations in the RFC, even though the ALJ found his mental impairments to be non-severe. (Doc. No. 6 at 5.) Snyder asserts that finding an impairment non-severe "is not the same as a finding of no medically determinable impairment," and maintains that the "ALJ failed to properly consider the additional impact of even non-severe mental health on Plaintiff's functioning and on the RFC." (*Id.* at 5-6.) Snyder maintains that his mental health struggles, even if mild, "still caused functional limitations on his ability to tolerate being around others and managing stress and his emotions." (*Id.* at 8.) Snyder argues that this is harmful error, as additional limitations would impact the Step Five finding. (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's finding that Snyder's mental health impairments were not severe and the ALJ's determination not to include any mental health limitations in the RFC. (Doc. No. 7 at 3.) The Commissioner argues that finding mild limitations in the

Paragraph B criteria "'do[es] not automatically mandate specific limitations in the RFC.'" (*Id.* at 5) (quoting *Phillips v. Comm'r of Soc. Sec. Admin.*, No. 3:22-CV-01144, 2023 WL 4078204, at *6 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted by* 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023)) (additional citation omitted). The Commissioner maintains that the ALJ considered all of Snyder's impairments, both severe and non-severe, in the RFC analysis, and therefore there is no error. (*Id.* at 5.)

"Before an ALJ can find that an individual is disabled, the ALJ must find that the individual has a 'severe' impairment." *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); *see also* 20 C.F.R. § 404.1520(a)(4)(ii). "If the individual has at least one severe impairment, the ALJ will then assess how much work the individual can still do." *Id.; see also* 20 C.F.R. § 404.1520(a)(4)(iv). When making that assessment, "the ALJ must consider limitations and restrictions imposed by all of [the] individual's impairments, even those that are not severe." *Kirkland*, 528 F. App'x at 427 (citing *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007)) (internal quotation marks omitted). *See also* 20 C.F.R. § 404.1523; *Pompa v Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Under the regulations, once the ALJ determines that a claimant has at least one severe impairment, the ALJ must consider all impairments, severe and non-severe, in the remaining steps."); *Draine v. Comm'r of Soc. Sec.*, No. 1:22-cv-1370, 2024 WL 1014030, at *16 (N.D. Ohio March 8, 2024) (citing *Pompa*). If the ALJ considers all the individual's impairments, the "failure to find additional severe impairments ... does not constitute reversible error." *Kirkland*, 528 F. App'x at 427 (citing *Fisk*, 253 F. App'x at 583) (brackets and internal quotation marks omitted). *See also Garris v. Comm'r of Soc. Sec.*, No. 3:11-cv-2538, 2013 WL 3990754, at *7 (N.D. Ohio Aug. 2, 2013) ("Any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error and 'legally irrelevant.'").

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative

determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996). "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)

(reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

At Step Two, the ALJ found several of Snyder's impairments to be severe, including diabetes mellitus and migraines, but found his mental impairments to be non-severe:

> When the claimant filed his applications for a period of disability, disability insurance benefits, and supplemental security income benefits, in addition to the severe impairments cited above, the claimant testified that several mental impairments and symptoms of mental impairments limit his ability to work. He said that his ability to work is compromised by depression, anxiety, agoraphobia and symptoms of sleeping all day, finding it hard to concentrate, being unable to get out of his vehicle when in public places and experiencing "stomch (sic), headache, sweaty, and hot" when in public places (Exhibit B1E).
>
> The claimant testified that one of the primary reasons he is unable to work is because he is unable to go out in public due to anxiety. He stated he believes symptoms of his mental impairments cause spikes in his blood sugar, contributing to poor control of diabetes. He said that he experiences anxiety almost every day. The claimant said that being around other people causes him to develop a "fight or flight" reaction that makes him angry and he avoids these situations because he does not want to act out against others. He attributed an increase in his symptoms to a new awareness of childhood trauma. He said that he had had a hard time establishing a reliable relationship with a therapist and had been without mental health treatment services for two years. During his hearing testimony, he explained that when he had attempted to set up appointments at the Nord Center, a staff person who was supposed to be treating

him told him that she was trying to take care of numerous individuals and could not always see him when he wanted. The claimant said that the last time that he had presented his case for disability, the Nord Center had failed to respond to a request for information. He reported that he had tried to set up appointments there and they did not call him back. However, he also said that they told him they would not schedule appointments for him because he had missed appointments. He said that he then tried to establish with a different mental health counseling agency, Charak, and was seen there for sessions. He further explained that it took him some time to reestablish with that agency because of homelessness and the fact that he didn't have a telephone. (Hearing testimony).

Because the available treatment records did not contain sufficient evidence to evaluate the claimant's allegations regarding his mental impairment, the state agency arranged for him to have a psychological consultative examination by Deborah Koricke, PhD on February 16, 2024 (Exhibit B2F). In addition to the report from this examination, the claimant's statements both in his hearing testimony and in evidence found throughout the record about his daily activities and how his mental impairments affect his functioning were considered when making the findings below.

There is one documented behavioral health consultation which occurred a few months prior to the claimant's alleged onset date for the current claims. The claimant's primary care provider referred the claimant for this evaluation. The clinician, Amber Hill, PhD noted that the claimant had 22 behavioral healthcare appointments documented in the past but this was the first evaluation for a new episode of care, because it had been more than a year since his last appointment. The claimant reported that he had been going to the Door Center but they left him "hanging," and he had run out of medications. Mental status observations were normal including full orientation, intact attention and memory, a cooperative attitude, and intact thought processes. The clinician did observe that the claimant appeared to have depressed affect and endorsed concerns regarding poor concentration and attention (Exhibit B1F/105-106).

In making this finding, the undersigned has considered the broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria and are part of the process known as the psychiatric review technique. The undersigned agrees with the findings of the state agency psychological consultants who reviewed the evidence at the initial and reconsideration levels of the claim. They each explained that they were not adopting the psychiatric review technique findings from the decision of the Administrative Law Judge for the prior claim filed by the claimant because there was additional evidence regarding the claimant's treatment for mental impairments, including a psychological consultative examination report. The Administrative Law Judge found for the prior claim that the claimant's mental

impairments are severe, cause limitation, and he included a mental residual functional capacity finding (Exhibit B1A/10).

The undersigned finds persuasive the explanation of the state agency medical consultants about their findings at the claimant has no more than mild limitation in any area of functioning. However, their rationale that they were not adopting the findings from the prior decision under the Drummond ruling is no longer appropriate, as that ruling has been rescinded. Under the requirements of AR 24-1(6), the findings of severe mental impairments and limitations associated with them in the decision for the prior claim have been considered; however, the current evidence no longer supports a finding of severe mental impairments. Based on the fresh review of the undersigned, the findings from the initial and reconsideration level of claim about the claimant's functioning in each of these areas of mental functioning are adopted and explained below.

*"Paragraph B" assessment*

The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation. At the psychological consultative examination the claimant attended in February 2024, he was able to recall details about his upbringing, education, past work, and medical/behavioral health history. He reported that he had attended school until partway through his senior year when he dropped out. He said that he left school to go to work and had never obtained a GED. He reported being able to maintain his schedule of taking medications by injection and orally to treat diabetes, hyperlipidemia, and depression. He also reported that he was able to cook meals, clean the house, and do laundry. Dr. Koricke offered the opinion that the claimant would be able to manage benefits if they were awarded. She reported that the claimant "answered very well" questions that had to do with abstract thinking. His general fund of knowledge was fair. Dr. Koricke opined that the claimant "appears able to understand, remember, and carry out instructions from a mental health viewpoint." (Exhibit B2F). Primary care and emergency room treatment records show that the claimant is able to answer questions and describe his symptoms. He indicates understanding of medical instruction. There are no concerns expressed by any of the clinicians who have treated the claimant that he lacks comprehension. He is able to check his own blood sugar intake injectable medication. There is no evidence of limitation in this area.

The next functional area is interacting with others. In this area, the claimant has mild limitation. The claimant reported at the psychological consultative examination that he was anxious because he was out in public; however, Dr. Koricke did not observe any objective signs of agoraphobia, panic attacks or anxiety. He reported that he lives with his girlfriend and her 13-year-old daughter. Dr. Koricke noted that the claimant was pleasant and cooperative during his appointment with her and she opined that he is "able to respond appropriately to authorities and to others and gets along adequately in the community." (Exhibit B2F). The claimant himself testified that he has a fear of

going out in public. However, the claimant attends medical appointments and has gone to the emergency department on his own. He is cooperative during treatment appointments and there is no mention that he expresses fearfulness or has complained about symptoms of agoraphobia, aside from the mental health evaluation discussed above in August 2022 (Exhibit B1F/106). There is no mention in treatment records of irritability with family members or others in the community. The record support no more than a finding of mild limitation of this area.

The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has no limitation. The claimant testified that he sleeps for at least half of the day. He told Dr. Koricke at the psychological consultative examination that when he has to work physically, he becomes very tired. However, he reported that he also spends time watching television and listening to the radio. During the examination, the claimant was able to perform adequately on tasks designed to assess his ability to concentrate, including a serial-7 subtraction task. He remained focused during the clinical interview and did not display any signs of distraction. In this area, Dr. Koricke opined that the claimant is "seen as having the ability to return to a job, ideally a desk type job where he does not have to exert himself physically to work as he reports that it is very difficult for him to do." She added that "in terms of the specific work abilities appears to be about average." (Exhibit B2F). The claimant reported a concern regarding his ability to pay attention and concentrate at the mental health evaluation he had in August 2022, prior to his alleged onset date; however, the clinician judged him to have intact attention and concentration. There is no mention other treatment records of the claimant being distracted or having a difficult time attending to conversations. There is no support in the record for a finding of limitation in this area.

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. When the claimant saw Dr. Koricke, he reported significant subjective feelings of depression, anxiety and agoraphobia and said that he did not believe his psychotropic medication was effective in reducing symptoms. He reported panic attacks. He denied hearing voices or seeing visual hallucinations. He said that he has a difficult time initiating sleep at night and awakens numerous times during sleep. Dr. Koricke noted that the claimant was dressed appropriately and appeared to have adequate hygiene. In this final area, Dr. Koricke expressed the opinion that the claimant "is able to react appropriately in the work setting." (Exhibit B2F). In his hearing testimony, the claimant endorsed similar symptoms, and focused mostly on having a difficult time tolerating being in public places. He had similar complaints when he saw a psychologist for a behavioral health evaluation August 2022 (Exhibit B1F/106). In contrast, virtually all of the mental status observations of the claimant at primary care appointments contain normal findings (Exhibit B1F/12, 84; B3F/9, 14). These records also show that the claimant remains cognizant of his parenting responsibilities and is able to resolve problems

independently. Taking the claimant's subjective complaints into account, the claimant has mild limitation in his ability to adapt and manage himself.

> The state agency psychological consultants relied to a large extent on Dr. Koricke's report and the opinions expressed there in to find that the claimant no longer has the severe mental impairments which were found in the decision for the prior claim. Their conclusion is reasonable and persuasive because this report is not contradicted by any of the available medical evidence. The undersigned adopts these findings, as no additional evidence was submitted after the reconsideration determination which suggests significant limitations associated with a mental impairment.
>
> The primary basis for this finding is that while the claimant's primary care provider advised him several times to follow up with psychiatry and establish a counseling relationship, his own and other treatment providers mental status observations are consistently unremarkable (Exhibits B1F/12, 43, 61, 84; B3F/9, 14, 30). In addition to the normal mental status findings at the claimant's medical appointments and in Dr. Koricke's report, there is no mention in the record of the visual and auditory hallucinations which the claimant testified he experiences. The claimant also testified that he does not go out in public very often; however, the record reflects numerous face-to-face appointments with his primary care provider and at least two with a Physician's Assistant specializing in endocrinology.
>
> Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

(Tr. 31-34) (emphasis in original).

In the RFC analysis, the ALJ further found as follows:

> First, as explained above, the claimant focused to a great degree in his hearing testimony on his mental health impairments being a barrier to work; however, virtually all of the primary care and hospital encounters document normal mental status findings (Exhibits B1F/12, 43, 50, 61, 84, 92; B3F/9, 14, 30). . . .
>
> * * *
>
> In this case, after reviewing the findings in the prior decision and the evidence cited therein, the undersigned finds that there is no change in the claimant's residual functional capacity, except that the evidence no longer supports the claimant's allegations regarding limitations associated with mental impairment. . . .

(*Id.* at 41.)

Substantial evidence supports the ALJ's RFC findings. The ALJ considered Snyder's mental health impairments in the RFC analysis, and therefore any Step Two error is harmless. Furthermore, as this Court has recognized, a "[c]laimant's mild limitations do not automatically mandate specific limitations in the RFC. *See, e.g.*, *Little v. Comm'r of Soc. Sec.*, No. 2:14-cv-532, 2015 WL 5000253, at *13–14 (S.D. Ohio Aug. 24, 2015) (finding no error where ALJ did not include RFC limitations to address findings of mild mental limitations); *Caudill v. Comm'r of Soc. Sec.*, No. 2:16-CV-818, 2017 WL 3587217, at *5 (S.D. Ohio Aug. 21, 2017) (finding that mild mental impairment does not require inclusion of mental limitations in RFC); *Walker v. Astrue*, No. 3:11-cv-142, 2012 WL 3187862, at *4–5 (S.D. Ohio Aug. 3, 2012) (finding that substantial evidence supported the ALJ's determination that the claimant's mental impairments were mild enough not to warrant specific RFC limitations)." *Phillips*, 2023 WL 4078204, at *6.

Though Snyder cites evidence that could support his allegations, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Judicial review is limited to "whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Castello v. Comm'r of Soc. Sec.,* 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011).

For all the foregoing reasons, the undersigned recommends the Court reject Snyder's RFC argument.

**B. Second Assignment of Error: Full and Fair Hearing**

In Snyder's second assignment of error, he argues that the ALJ failed to ensure he received a full and fair hearing under SSR 13-1p and HA 01330.002 by "limiting [his] ability to testify and denying a

requested supplemental hearing." (Doc. No. 6 at 8.) Snyder asserts that the ALJ's limitation of his testimony to 15 minutes "did not allow him the opportunity to fully present testimony and provide relevant information." (*Id.*) Snyder maintains:

> Additionally during testimony, Plaintiff noted receiving treatment for his mental health and migraines, evidence missing from the record evidence. (Tr. 59, 61). The ALJ interrupted Plaintiff's testimony to move on to take vocational expert testimony. (Tr. 51, 64). The ALJ did not inquire nor allow Plaintiff representative to inquire as to where Plaintiff was seeking mental health and if it was new and previously unknown treatment, request the records.

(*Id.* at 9.) Snyder argues that the ALJ's "failure to inquire, or allow inquiry, into new and material missing treatment records is harmful error and one which warrants remand." (*Id.*)

The Commissioner responds that this Court recently "directly addressed and rejected this precise argument." (Doc. No. 7 at 6) (citing *Scott v. Comm'r of Soc. Sec. Admin.*, No. 1:23-cv-01765-BMB, 2024 WL 3678788 (N.D. Ohio July 15, 2024), *report and recommendation adopted by* 2024 WL 3675802 (N.D. Ohio Aug. 6, 2024)). The Commissioner argues that, like *Scott*, the ALJ "stated at the outset of the hearing that she was 'allotting 45 minutes'" for Snyder's hearing, 15 minutes of which was to cover Snyder's health issues. (Doc. No. 7 at 7.) The Commissioner maintains that Snyder "testified extensively at his hearing," and therefore the ALJ did not err in "reasonably limiting" Snyder's time to testify. (*Id.*) The Commissioner asserts that Snyder's argument that the ALJ erred in failing to order a supplemental hearing should also be rejected, as Snyder fails to discuss the applicable HALLEX provisions or argue that he meets the requisite criteria; therefore, he fails to show a supplemental hearing was appropriate. (*Id.* at 7-8.)

In the ALJ's decision, the ALJ explained that, after the hearing, Snyder's counsel had objected to the limitation on his testimony and requested a supplemental hearing. (Tr. 28.) The ALJ denied Snyder's request for a supplemental hearing as follows:

> In addition, after the hearing, Ms. Sanders submitted a letter of protest, stating that she and her client had not been granted a sufficient amount of time to fully present his case. She stated that there were additional material facts that should be addressed and requested a supplemental hearing. This request is denied. At

> the outset of the hearing, the undersigned explained to both the claimant and his representative that the hearing would consist of three segments, each lasting approximately 15 minutes. One of those segments would involve claimant testimony regarding his allegations. The transcript of the hearing shows that the claimant gave testimony regarding how his impairments affect him from 9:16 AM until 9:31 AM. Moreover, the claimant's representative had ample time between when the hearing was scheduled and the hearing itself to prepare a written brief highlighting case facts and making arguments on the claimant's behalf. Therefore, the request for supplemental hearing is denied.

(*Id.*)

In *Scott*, this Court discussed a similar due process argument and explained as follows:

> The Due Process Clause of the Fifth Amendment establishes that no deprivation of life, liberty, or property will occur without notice and an opportunity for a fair hearing. *Flatford v. Chater*, 93 F.3d 1296, 1303 (6th Cir. 1996). Because social security claimants have a property benefit for which they hope to qualify, this element is readily satisfied. *Id.* at 1304; *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("The interest of an individual in continued receipt of [social security benefits] is a statutorily created 'property' interest protected by the Fifth Amendment."). To prevail on a due process claim, the claimant must establish that the United States attempts to deprive her of a protected interest. *Flatford*, 93 F.3d at 1303-04. Due process also requires a Social Security hearing to be "full and fair," *id.* at 1305 (citing *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971)), meaning that claimants should be given a "meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349.
>
> To the extent that Ms. Scott relies on HALLEX to establish a due process violation, this argument is unavailing. Although HALLEX describes policies ALJs should follow when conducting hearings and reviewing a claimant's case, HALLEX's procedural guidance is not binding on this court. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *see also Robberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019) ("Importantly, HALLEX is an internal guidance tool that does not have the force of law...Indeed, HALLEX does not impose judicially enforceable duties on either the ALJ or this Court."); *Alilovic v. Astrue*, No. 1:12-cv-323, 2012 WL 5611077, at *7 (N.D. Ohio Nov. 15, 2012) (HALLEX "is not published in either the Federal Register or the Code of [Federal Regulations] and does not have the force of law.") And procedural due process rights do not arise from HALLEX violations alone. *See Eboch v. Comm'r of Soc. Sec.*, No. 5:12-cv-649, 2012 WL 7809080, at *4 (N.D. Ohio Dec. 13, 2012), *report and recommendation adopted*, 2013 WL 1284353 (N.D. Ohio Mar. 27, 2014) ("[A]gency procedures set forth in HALLEX may embody, but do not *create* federal due process rights for claimants.") (emphasis in original); *see also Lawrence v. Colvin*, No. 3:13-032-DCR, 2014 WL 640990, at *4 (E.D. Ky. Feb. 18, 2014), *aff'd sub nom. Lawrence v. Comm'r of Soc. Sec.*, 591 F. App'x

470 (6th Cir. 2015) (collecting cases). Indeed, "[n]o circuit has held that...HALLEX creates *constitutional rights* because, of course, only the Constitution, not an agency's rules or procedures, is the source of such rights." *Dukes v. Comm'r of Soc. Sec.*, No. 1:10-cv-436, 2011 WL 4374557, at *9 (W.D. Mich. Sept. 19, 2011) (quoting *Davenport v. Astrue*, 417 F. App'x 544, 547-48 (7th Cir. 2011) (emphasis in original)).

But Ms. Scott appears to intertwine her argument that her procedural due process rights were violated with her argument that she was denied a "full and fair" hearing because the ALJ refused to allow her counsel to continue his examination regarding her migraine headaches and/or schedule a supplemental hearing so that she could provide testimony on this issue. (*See* ECF No. 6, PageID#1379.) Specifically, she argues that the ALJ's actions "deprived [her] of presenting a complete picture of how her impairments affected her ability to engage in substantial gainful activity on a full-time and sustained basis." (*Id.* at PageID#1380.)

The Sixth Circuit has held that the ALJ bears the burden to fully develop the record, and the failure to do so may deny the claimant a full and fair hearing. *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1982). There is, however, no bright-line test to determine if an ALJ has met the duty to develop the record fully it must be determined on a case-by-case basis. *Id.* at 1052; *see also Young v. Comm'r of Soc. Sec.*, No. 5:20-CV-01152-DAC, 2021 WL 3190826, at *8 (N.D. Ohio July 28, 2021).

**Ms. Scott cites no authority for the proposition that an ALJ violates due process principles merely because the ALJ placed limits on her testimony.** (*See* ECF No. 6, PageID#1379 (asserting that the ALJ had "arbitrarily allotted 15 minutes for testimony")). Due process is not a "technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, (1972)). **A plaintiff does not have an absolute right to present unlimited evidence; she is subject to the due process concept of reasonableness.** *Liu v. U.S. Dep't of Justice*, 13 F.3d 1175, 1177 (8th Cir.1994)*see also N.L.R.B. v. Midwestern Pers. Servs., Inc.*, 508, F.3d 418, 427 (7th Cir.2007) (finding that ALJ did not unreasonably restrict cumulative testimony). **In the social security context, it is appropriate for an ALJ to reasonably limit a plaintiff's testimony or evidence.** *See Pate v. Astrue*, No. H-08-249, 2009 WL 4825206, at *9 (S.D. Tex. Dec. 8, 2009) (finding that any limits imposed by the ALJ were reasonable and did not infringe on plaintiff's due process rights because the record showed that counsel could question plaintiff and VE).

**Courts have held that an ALJ may place reasonable limitations on testimony if the claimant was afforded at least some opportunity to provide**

**testimony on the disputed issues.** For example, in *Chase D. v. Kijakazi*, the ALJ stated at the outset that the hearing would be limited to "30-40 minutes," and the plaintiff challenged this limitation on appeal to the U.S. District Court for the District of Minnesota. No. 20-cv-1292 (ADM) (TNL), 2022 WL 479357, at *6-7 (D. Minn. Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 484986 (D. Minn. Feb. 16, 2022). The *Chase D.* court held that the requirements of due process had been satisfied by a single, 38-minute hearing; the opportunity to request a second, supplemental hearing; and the opportunity to "submit a closing statement to the ALJ in writing." *Id.* at *8. In *Carolyn K. v. Kijakazi*, an ALJ likewise imposed time limitations at the outset of a hearing, and the plaintiff also challenged the limitation on appeal, arguing that she had been "forced to shorten her own testimony." No. 20-cv-1394 (NEB) (LIB), 2022 WL 543076, at *8 (D. Minn. Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 542418 (D. Minn. Feb. 23, 2022). The *Carolyn K.* court held that the plaintiff provided substantial testimony to develop a full and fair record within the 41-minute hearing because the plaintiff "testif[ied] about her subjective complaints, how her symptoms prevented her from working, her past employment and the activities she performed therein." *Id.* at *7. And in *Pate v. Astrue*, No. H-08-249, 2009 WL 4825206, at *9 (S.D Tex. Dec. 8, 2009), the district court found that the ALJ did not violate claimant's procedural due process rights when limiting testimony because the claimant's counsel did not object to the time limitation; the record showed that claimant's counsel questioned her "at some length about her impairments, limitations, and difficulties in school"; and the claimant had not "alleged or shown that counsel was unable to present certain testimony or evidence or that the ALJ's consideration of [the claimant's] impairments was hindered by counsel's inability to question the claimant at more length."

Here, the ALJ explained that the hearing would be 45 minutes in length, with 15 minutes allotted to the claimant's testimony. (Tr. 55.) While Ms. Scott's counsel elicited testimony from Ms. Scott, the testimony primarily related to Ms. Scott's mental impairments – not her migraines. (*See generally* Tr. 62-66.) And the ALJ denied Ms. Scott's counsel's requests to conduct further questioning about her migraine headaches or to schedule a supplemental hearing on this issue.(Tr. 67-68.)

Unlike *Chase D., Carolyn K.,* and *Pate,* the limitations imposed by the ALJ here were not reasonable because the ALJ did not allow Ms. Scott a fair opportunity to testify regarding her subjective complaints related to her migraine headaches and how these symptoms prevented her from working. In addition, unlike the counsel in *Pate*, Ms. Scott's counsel objected to the ALJ's time limitation and requested a supplemental hearing, which the ALJ denied. *See* (Tr. 67 (counsel disagreeing with ALJ's denial of supplemental hearing request, stating that he was "going to have to appeal if [there was an] unfavorable decision," and asserting that claimant's testimony dealt with her mental health impairments, not her migraines)). Moreover, Ms. Scott can show prejudice resulting from the ALJ's actions because, as discussed above, the

> ALJ's determination that Ms. Scott's migraines did not satisfy Listing 11.02 is not supported by substantial evidence. *Cf. Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 329 (6th Cir. 2020) ("[A] party must show that it was prejudiced in order to succeed on a due process claim."). Thus, I recommend remand so that the ALJ may afford Ms. Scott a full and fair hearing with a reasonable opportunity to testify about her migraine headaches.

2024 WL 3678788, at **17-19 (emphasis added).

A review of the hearing transcript reveals the ALJ afforded Snyder a full and fair hearing. Snyder spent most of the time allotted to his medical issues testifying to his mental health impairments, symptoms, and treatment. (Tr. 55-63.) Unlike *Scott*, Snyder's counsel did not object to the time limitation at the hearing nor argue at the hearing that Snyder had not had an opportunity to fully testify regarding his mental health and migraine symptoms and how they prevented him from working. (*Id.* at 48-69.) Contrary to Snyder's argument, the ALJ did not interrupt counsel's questioning of Snyder during his testimony regarding his mental health treatment and any gaps; rather, the ALJ moved on to the VE's testimony after Snyder's testimony regarding his diabetes medication and side effects. (*Id.* at 63-64.) Indeed, the hearing transcript shows Snyder testified that he had recently started seeing a counselor at "Sharrock" and the reasons for his two-year gap in seeing a counselor. (*Id.* at 57-59.) Unlike *Scott*, the ALJ's time limitations did not prevent Snyder from testifying to his migraine headaches either; he testified to the frequency of his migraine headaches, his symptoms, and his treatment. (*Id.* at 61-62.) Rather, Snyder's testimony was sufficient for the ALJ to determine the extent of Snyder's mental and physical limitations and Snyder fails to show that he was prejudiced by the time limit on his testimony or the denial of a supplemental hearing. *See Carolyn K.*, 2022 WL 543076, at *7 ("Plaintiff's testimony was sufficient to determine the extent of Plaintiff's physical limitations, as required, for a proper RFC determination."); *Chase D.*, 2022 WL 479357, at *8 ("In sum, Plaintiff has not shown that the length of his hearing, nor the denial of his request for a supplemental hearing, demonstrate he was prejudiced or treated unfairly by the ALJs [sic] development of the record.")

For all the foregoing reasons, the undersigned recommends the Court reject Snyder's due process argument.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: October 15, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**